*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0801**

In the Matter of the Welfare of the Child of: G. M. L. and T. M. M., Parents

**Filed October 20, 2014
Affirmed
Connolly, Judge**

Anoka County District Court
File Nos. 02-JV-13-1398, 02-JV-13-1268

Patricia A. Zenner, Zenner Law Office, Stillwater, Minnesota (for appellant-G.M.L.)

Anthony C. Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, Minnesota (for respondent)

Lauren R. Cains, Ramsey, Minnesota (guardian ad litem)

Considered and decided by Hooten, Presiding Judge; Connolly, Judge; and Johnson, Judge.

## UNPUBLISHED OPINION

**CONNOLLY**, Judge

Appellant-mother challenges the district court's termination of her parental rights. Because evidence supports the district court's findings that appellant is palpably unfit to be a party to the parent-child relationship and that respondent county made adequate efforts to reunite appellant with her child and the district court's ultimate finding that

termination of appellant's parental right was in her child's best interests was not an abuse of discretion, we affirm.

## FACTS

Appellant G.M.L. is the mother of five children. In 2009, she voluntarily transferred custody of her first three children, then 12, 10, and 6, to their paternal grandparents after they were removed from her custody and declared to be children in need of protection or services (CHIPS) because she was using methamphetamine.

In 2011, she and T.M.M., the father of her fourth and fifth children, voluntarily agreed to the termination of their parental rights to the fourth child, then a year old, after he had been removed from their care because they were using methamphetamine. This child has been adopted by a cousin of G.M.L. and his wife.

Appellant's fifth child, M., whose custody is the subject of this appeal, was born to her and T.M.M. on June 17, 2013.[1] Appellant resumed the use of methamphetamine in July 2013. In August 2013, a stabbing occurred in the residence where M. was living with appellant and T.M.M. When T.M.M. told appellant to drive the victim to the hospital, she did so, leaving M. in the care of T.M.M. She later testified that she did not really think about who would care for M. when she left, that the person who would have cared for him was T.M.M., and that T.M.M. "wasn't all there" at that time. The following day, T.M.M. was arrested because, after his car was pulled over, a search of his person revealed that he had $1,000 in cash and a dog search of his car revealed a bag

---

[1] T.M.M. voluntarily terminated his parental rights to M.

2

containing about one gram of methamphetamine, a large number of needles, and a scale was in his vehicle.

On September 2, T.M.M. was arrested for possession of methamphetamine when a neighbor reported that he was using drugs and causing problems. Two bags containing 4.9 grams and 5.2 grams of methamphetamine were found on him.

On September 6, a CHIPS petition was filed on M., who was removed from the home. On September 10, when a social worker from respondent Anoka County (the county) was scheduled to observe a visit of M. and his parents, appellant was unable to wake T.M.M. for the visit, and he threatened her when she attempted to wake him. On September 13, T.M.M. refused to attend a scheduled visit with M. because he did not like the social worker. Appellant admitted having known for several months that T.M.M. had been dealing methamphetamine. She claimed that she had not used methamphetamine for the past year, but did not comply with a request for random urinalysis (UA) tests.

On September 17, appellant was 35 minutes late for a scheduled visit with M., who had already left when she arrived. Appellant told the social worker that she and T.M.M. had been fighting until three o'clock in the morning and that he had taken her phone. The social worker offered appellant information on a women's shelter, but appellant declined it.

At a scheduled visit on September 19, T.M.M. became angry and agitated, then violent, and he was asked to leave. Appellant's cousin and his wife, who had adopted appellant's fourth child, expressed an interest in providing foster care for M., who is the adopted child's full sibling.

3

On September 24, appellant cancelled the visit she and T.M.M. were scheduled to have with M., saying they had car trouble. On September 30, appellant was informed that after a visit scheduled for the next day, M. would be placed with his sibling at her cousin's home in kinship foster care.

On October 10, the county filed a petition to terminate appellant's parental rights. On October 21, appellant had a positive UA result, although she initially denied that she had used methamphetamine.

On November 29, when appellant was arrested for allowing T.M.M. to drive her uninsured vehicle, she admitted that she had two bags of methamphetamine concealed in her vagina.[2] Appellant entered a residential chemical-dependency program in January 2014, completed the program in February, and entered an extended treatment program in March. She continued to have a relationship with T.M.M., who voluntarily terminated his parental rights to M. just before the trial.

Following trial, the district court terminated appellant's parental rights to M. She challenges the termination, arguing that evidence did not support the district court's findings that appellant is palpably unfit to be a parent to M. and that the county provided reasonable efforts to reunite appellant and M. and that the district court's ultimate finding that termination of appellant's parental rights is in M.'s best interests was an abuse of discretion.[3]

---

[2] At the time of trial, felony charges resulting from this incident had not been resolved.

[3] Appellant also appears to argue that: (1) a parent is presumptively fit to care for that parent's children, *see, e.g.*, *In re Welfare of A.P.*, 535 N.W.2d 643, 647 (Minn. 1995);

# DECISION

## 1.    Finding of Palpable Unfitness

The district court concluded that appellant's parental rights should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(4) (2012), providing that one ground for termination is a finding that

> a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.

This court will "affirm the district court's termination of parental rights when at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the best interests of the child, provided that the county has made reasonable efforts to reunite the family." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008) (citations omitted). While the reviewing court "give[s] considerable deference to the district court's decision to terminate parental rights," it will also "closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *Id.*

---

(2) if a parent's rights to other children were involuntarily terminated, that parent is presumptively unfit, *see* Minn. Stat. § 260C.301, subd. 1(b)(4) (2012); and (3) because appellant's parental rights to her other children were not involuntarily terminated, she is presumptively fit to be a parent. This argument is fallacious: in a hypothetical syllogism, no valid conclusion can be drawn from a denial of the antecedent.

5

M., born in June 2013, was nine months old at the time of trial. The district court found by clear-and-convincing evidence that, during those nine months: (1) appellant resumed using methamphetamine; (2) appellant left M. in a residence where a stabbing had just occurred while she drove the victim to the hospital, leaving M. in the care of T.M.M., who was not "all there" and who was later charged with the assault; (3) appellant admitted knowing that T.M.M., who lived with her and M., had been dealing methamphetamine; (4) appellant refused to provide a specimen for a UA, although she claimed she had not been using methamphetamine; (5) appellant missed one scheduled visit with M. because she was 35 minutes late, and declined information on a women's shelter although she said she and T.M.M. had been fighting, and called to cancel another visit because she and T.M.M. were having car trouble; (6) appellant's UA was positive for methamphetamine, but she denied she had been using the drug; (7) when appellant was arrested for allowing T.M.M. to drive her uninsured vehicle, she admitted she had two bags of methamphetamine concealed in her vagina, resulting in felony charges; (8) four months after M. was taken from her home, appellant entered a treatment program, admitting that she had used methamphetamine earlier that day; (9) at the time of trial, appellant had been free of drugs for only 60 days, 30 of which had been spent in a treatment facility; and (10) appellant knew T.M.M. was a drug dealer, "had no qualms about living off the proceeds of [his] criminal activity", described T.M.M. as her fiancé, and "demonstrate[d] little insight into how her addiction and her relationship with [T.M.M.] have affected . . . [M]."

Appellant argues that the evidence does not support these findings, but the findings are based on her own testimony. On direct examination, when asked if she had kept M. safe, she answered, "I've kept him safe but I'm an addict. I have my faults." She answered, "Yes" when asked if T.M.M. was an addict, had been an addict before M. was born, and had been to prison for drug-related offenses. She testified that T.M.M.'s statement that he cooked methamphetamine for seven years so a lot of people owed him favors and he never had to pay for methamphetamine "sound[ed] like something he would say."

When asked if she now understood that T.M.M.'s position as a drug dealer could potentially harm M., she said she had come to that realization "right around the stabbing", i.e., in August 2013, and answered "Yes" when asked if she had continued her relationship with T.M.M. with that knowledge. She agreed that she had told her social worker that her relationship with T.M.M. was going to continue. She also answered "Yes" when asked if her relationship with T.M.M. continued "despite the stabbing that occurred in your home" and after T.M.M.'s arrest when he was found in her front yard with a scale and methamphetamine in his possession. When asked how T.M.M. came to have $407 in his pocket when he was arrested in October, she said, "[h]e was obviously selling drugs," agreed that she knew T.M.M. had been arrested for driving with a revoked license "probably in excess of 20 times," and added that some of the times he had been driving her vehicles.

When asked if it was true she did not enter treatment until she had been charged with a criminal offense, four months after M. had been taken from her home, she said

"Correct" and agreed that she went to treatment because she hoped the court would deal more leniently with her criminal charges if she went to treatment. She testified that her drug use had been much more extensive than the three instances of which Social Services was aware and that she had not been honest with Social Services. She also testified that, although she had been successfully discharged from four treatment programs, she was unable to maintain sobriety.

When asked if she was still in a relationship with T.M.M. and if her discharge summary referred to T.M.M. as her fiancé, she answered "Yes"; when asked if she foresaw an ongoing relationship with him, she said, "I'm unsure of what the future holds." Finally, when asked if she saw T.M.M. as a negative influence and an obstacle to her remaining sober, she agreed, but when asked if she maintained a relationship with him, answered, "Yes, I do."

On cross-examination, when appellant was asked who cared for M. while she took the stabbing victim to the hospital, she said "That would have been [T.M.M.]"; when asked to describe T.M.M.'s behavior the night of the stabbing, she said, "He wasn't all there." She testified that she did not really think about who would be caring for M. when T.M.M. told her to take the victim to the hospital. She also testified that she was aware of the violence and high risk of a dangerous lifestyle implied by T.M.M.'s drug dealing, but that she believed M. was safe in her home "when [T.M.M.] wasn't around." Finally, appellant testified that, although T.M.M. is not part of her lifestyle now because he is in prison, she has not ruled out the possibility of their future relationship.

8

Appellant's unwillingness to sever her connection with T.M.M., despite knowing that he is a drug user and dealer and that his lifestyle is likely to lead to violent and dangerous conditions, is a specific condition directly relating to the parent and child relationship that renders her unable, for the foreseeable future, to provide for M.'s needs. *See* Minn. Stat. § 260C.301, subd. 1(b)(4). Evidence supports the district court's finding that appellant is palpably unfit to be a party to a parent-child relationship with M.

## 2. Reasonable Efforts

Appellant also challenges the district court's finding that the county made reasonable efforts to reunite her and M., arguing specifically that the county should have taken T.M.M. out of her home. But appellant testified repeatedly that she was not honest with Social Services, that she rejected information about a place to go to be safe from T.M.M., that she did not want to change her residence, that she and T.M.M. have been separated only when he has been in prison, and that she does not rule out their future relationship. Therefore, the district court's finding that, although the county did not attempt to remove T.M.M. from appellant's home, it did make reasonable efforts to unite her and M. is supported by the evidence.

Moreover, appellant repeatedly testified that she maintained her relationship with T.M.M. and allowed it to dominate her actions, including following T.M.M.'s instruction to take the stabbing victim to the hospital even though it meant leaving M. in the care of T.M.M., who was in a deranged condition in a house where a violent stabbing had just occurred.

Appellant also appears to argue that, because she successfully completed chemical-dependency treatment several times but repeatedly relapsed, the county should have focused on something other than her chemical dependency. But she does not refute the county's view that, unless and until her chemical dependency was resolved, other programs would not have been helpful, and she blames the county for not having ended her relationship with T.M.M. although she repeatedly testified that she did not, and does not, want the relationship to end.

Moreover, in terminating parental rights, the best interests of the child are the paramount consideration, and conflicts between the rights of the child and the rights of the parents are resolved in favor of the child. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 902 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). While it may have been in appellant's best interests to end her relationship with T.M.M., the county's concern was with M.'s best interest, and that interest was served by removing him from appellant's home to which she admitted that T.M.M. was likely to return.

Evidence supports the district court's finding that the county made reasonable efforts to reunite appellant and M.

### 3. The Child's Best Interests

"We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *Id.* at 905. Appellant argues that M. should remain in the CHIPS program if he cannot be returned to her custody now. But this argument ignores M.'s need for permanency. *See In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004) (affirming finding that child's best interest

10

supported termination where the child had an immediate need for permanency and stable, drug-free, nurturing caregivers). M. has already experienced a violent and dangerous environment while in appellant's custody and has been removed to a safe environment with his sibling. His need for that environment to be permanent outweighs any interest of appellant in having him eventually returned to her.

The district court did not abuse its discretion in concluding that termination of appellant's parental rights is in M.'s best interests.

**Affirmed.**